**John L. METE and Merrill J. Gottlieb, individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**NEW YORK STATE OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES and New York State Department of Civil Service, Defendants.**

**No. 92–CV–169 NPM.**

United States District Court,
N.D. New York.

Nov. 6, 1997.

---

4. Interboro, in fact, already has brought suit in state court contesting many of the Comptroller's disallowances.

Law Offices of Leonard N. Flamm, (Leonard N. Flamm, Norman Mednick, Maria D.

Beckman, and Jill Schwartz, of counsel), New York City, for Plaintiffs.

Dennis C. Vacco, Attorney General of the State of New York, (Robert A. Siegfried, Assistant Attorney General, of counsel), Albany, NY, for Defendants.

## MEMORANDUM-DECISION & ORDER

McCURN, Senior District Judge.

## I. INTRODUCTION

In this class action suit, plaintiffs allege that defendants New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD") and New York State Department of Civil Service ("DCS") (collectively "defendants") discriminated against them on the basis of their age in violation of the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621–634 ("ADEA" or the "Act"), and the New York Human Rights Law, New York Executive Law §§ 290–298 (the "HRL"). Jurisdiction is premised upon 28 U.S.C. §§ 1331 & 1367(a) and venue is proper pursuant to 28 U.S.C. § 1391(b). Presently before the court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Subsequent to the filing of this motion, the court, sua sponte, raised the issue of its subject matter jurisdiction to entertain this action. *See, e.g., Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 107 (2d Cir.1997) (a challenge to subject matter jurisdiction cannot be waived and may be raised sua sponte at any time); Fed.R.Civ.P. 12(h)(3). The court raised the issue of its subject matter jurisdiction as a result of the Supreme Court's decision in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (*"Seminole Tribe"*), which called into question whether Congress abrogated the states' Eleventh Amendment immunity pursuant to a legitimate exercise of power when enacting or amending legislation such as the ADEA. *See Seminole Tribe,* 517 U.S. at 74, 116 S.Ct. at 1133 (Court held suit was barred by the Eleventh Amendment and therefore must be dismissed for lack of subject matter

jurisdiction). The parties submitted supplemental briefs addressing this issue. Having considered the arguments of the parties and the relevant law, the court concludes that it maintains subject matter jurisdiction to consider the merits of plaintiffs' claims pursuant to the ADEA. With respect to plaintiffs' state law claims, however, the court concludes that it does not maintain subject matter jurisdiction. In addition, having reached the merits of defendants' summary judgement motion pursuant to the ADEA, the court denies the motion for the reasons set forth herein.

## II. FACTS

In 1989, defendant OMRDD undertook a staff reduction-in-force ("RIF"). *See* Affidavit of Arthur Y. Webb, attached to docket document number ("Dkt.") 36, ("Webb Aff.") at ¶¶ 6–7. The RIF included, *inter alia,* the elimination of the Chiefs of Service ("Chiefs"), an entire level of management at OMRDD. *See id.* at ¶¶ 6, 11. The RIF, according to defendants, was precipitated by New York State's severe budgetary crisis during fiscal year 1989–1990. *Id.* at ¶¶ 2–4. As a result of the RIF, all 46 Chiefs, each one of whom was over the age of 40, were terminated, demoted, forced to retire, or resigned from their employment. *See* Joint Affidavit of John L. Mete and Merrill J. Gottlieb, Dkt. 46, ("Mete and Gottlieb Aff.") at ¶ 13; Affidavit of Robert A. Siegfried, Dkt. 52, ("Siegfried Aff.") at exhibit "A." The Chiefs who continued employment with OMRDD were demoted with a corresponding diminution of salary and responsibility. *See* Mete and Gottlieb Aff. at ¶¶ 13–14.

In addition to eliminating the Chiefs, the RIF affected other employees as well. *See* Webb Aff. at ¶ 10; Mete and Gottlieb Aff. at ¶ 15. However, the Chiefs were the only management level employees at OMRDD who were targeted for total elimination. *See* Mete and Gottlieb Aff. at ¶ 15. There were a total of 163 employees affected by the RIF and 122, or 74.8%, were over the age of 40. *See* Affidavit of David F. Greenberg, PhD., Dkt. 46, ("Greenberg Aff.") at ¶ 3. OMRDD's over age 40 employee population at the time of the RIF, however, was 46.5%. *See* Mete

and Gottlieb Aff. at ¶ 15; Greenberg Aff. at ¶¶ 5–6.

Defendants assert that the decision to eliminate the Chiefs arises from as far back as a 1981 task force study. Plaintiffs counter that defendants are attempting to ride the coattails of prior documentation by rewriting its significance to the RIF and further, dispute defendants' interpretation of the study. *See* Mete and Gottlieb Aff. at ¶ 24. The task force, which was comprised of members from OMRDD, DCS and the Division of Budget, concluded that the Chiefs appeared to have inappropriate and inadequate responsibilities, functions and workloads for their level of compensaion. *See* Affidavit of William McChesney, Dkt. 36, ("McChesney Aff.") at ¶¶ 2–7, 15. The task force recommended that the Chiefs' positions and compensation be altered to better reflect their responsibilities. *See Id.* at ¶¶ 23–24.

In 1985, after years of deliberations, DCS approved the recommendations of the task force and created the new title of "Developmental Service Manager" to replace the title of Chief. *See* Affidavit of Barbara A. Hawes, attached to Dkt. 36, ("Hawes Aff.") at ¶ 3. The Developmental Service Manager performed the identical functions of the Chiefs. *See* Mete and Gottlieb Aff. at ¶ 10 fn. 1. The Chiefs' positions were then earmarked by the Division of Budget and DCS. *See id.* The effect of the earmark was that no vacated Chief position could be filled without first being reclassified. *See id.*

In 1989, the State of New York experienced a severe financial crisis. *See* Webb Aff. at ¶ 2. This crisis, according to defendants, necessitated that the RIF be implemented. *See id.;* Hawes Aff. at ¶ 6. According to Commissioner Webb, three general objectives were followed when selecting the positions that would be affected by the RIF: (1) enhance the overall efficiency of OMRDD; (2) reduce the number of unnecessary positions and functions; and (3) match up available resources with consumer needs. *See* Webb Aff. at ¶ 5.

After consulting with senior staff members and directors of the various developmental disabilities offices ("Directors"), and in consideration of the organizational restructuring of OMRDD, Commissioner Webb determined that the Chiefs should be eliminated as part of the RIF. *See id.* at ¶¶ 6, 10–11. The decision to eliminate the Chiefs was, according to defendants, made pursuant to an agency-wide assessment which concluded that the Chiefs' functions were outmoded and incompatible with OMRDD's future plans. *See id.*

The individuals who participated in the RIF and its implementation were: Arthur Y. Webb, OMRDD's Commissioner at the time of the RIF; Elin M. Howe, then Executive Deputy Commissioner; Barbara Hawes, Deputy Commissioner for Program Operations; and Thomas A. Maul, Deputy Commissioner for Administration and Revenue Management. *See* Webb Aff. at ¶ 6; Hawes Aff. at ¶ 6; Defendants' Reply Memorandum, Dkt. 51, ("Def. Reply Mem.") at 6. The development and implementation of the RIF also involved the Director where each Chief was employed. *See* Webb Aff. at ¶ 6.

Prior to the RIF, no study was conducted to determine the impact on over age 40 employees. *See* Webb Aff. at ¶¶ 12–13; Mete and Gottlieb Aff. at ¶ 16(b) and (c). In addition, there were no guidelines advanced to ensure that age was not a determining factor in selecting which employees would be affected by the RIF. *See id.* After the RIF, the functions and duties of the Chiefs were either redistributed at the discretion of each Director among the existing OMRDD employees or, if outmoded, their functions and duties were eliminated. *See* Hawes Aff. at ¶¶ 5–6; Mete and Gottlieb Aff. at ¶ 17.

## III. DISCUSSION

Before reaching the merits of defendants' motion, the court must address its subject matter jurisdiction. The court's jurisdiction ultimately turns on whether defendants enjoy immunity pursuant to the Eleventh Amendment to the United States Constitution. *See, e.g., Seminole Tribe,* 517 U.S. at 74, 116 S.Ct. at 1133.

### A. *Jurisdiction and the Eleventh Amendment*

#### 1. *Federal Law Claims*

 The Eleventh Amendment provides:

The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. While the literal text of the Amendment only seems to divest federal courts of jurisdiction in diversity cases, the Supreme Court has interpreted this Amendment to also preclude federal courts from hearing cases against a state by its own citizens. *See Hans v. Louisiana,* 134 U.S. 1, 13, 10 S.Ct. 504, 506, 33 L.Ed. 842 (1890); *see also Blatchford v. Native Village of Noatak,* 501 U.S. 775, 779, 111 S.Ct. 2578, 2581, 115 L.Ed.2d 686 (1991). The Amendment applies with equal force to agencies and subdivisions of the states inasmuch as the state is the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984).[1] Thus, as a general rule, the Eleventh Amendment provides that a state is immune from suit in federal court.[2]

This general rule does not mean, however, that a state may never be sued in federal court. A state may consent to jurisdiction or waive its immunity by "express language" or by "overwhelming implication." *See Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). Additionally, Congress may abrogate a state's immunity to suit in federal court pursuant to a valid exercise of power. *See Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–426, 88 L.Ed.2d 371 (1985). Here, defendants have not consented to jurisdiction, nor have they waived their immunity from suit. Therefore, the court has subject matter jurisdiction only if Congress properly abrogated defendants' immunity when enacting the ADEA or its amendments.

In *Seminole Tribe,* the Supreme Court clarified and reiterated a two-prong inquiry for determining whether Congress properly abrogated the states' immunity.

*See Seminole Tribe,* 517 U.S. at ——, 116 S.Ct. at 1123. First, has Congress " 'unequivocally expresse[d] its intent to abrogate the immunity?' " and second, has Congress "acted 'pursuant to a valid exercise of power?' " *Id.* (quoting *Green v. Mansour,* 474 U.S. at 68, 106 S.Ct. at 426). Accordingly, the court will utilize this inquiry to determine whether Congress properly abrogated the states' immunity when it enacted the ADEA and the amendments thereto.

### a. Intent to Abrogate

In determining whether Congress intended to abrogate the states' immunity, the court must find that Congress has clearly expressed its "intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 243, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171 (1985); *see Seminole Tribe,* 517 U.S. at ——, 116 S.Ct. at 1123 ("Congress may abrogate the States' constitutionally secured immunity from suit in federal court only be making its intention unmistakably clear in the language of the statute.") (citing *Dellmuth v. Muth,* 491 U.S. 223, 227–228, 109 S.Ct. 2397, 2399–2400, 105 L.Ed.2d 181 (1989) (internal quotations omitted)). In *Seminole Tribe,* the Court found the first prong of the test satisfied when Congress enacted the Indian Gaming Regulatory Act of 1988 (codified as amended at 25 U.S.C. §§ 2701, *et seq.*) because Congress provided an " 'unmistakably clear' statement of its intent to abrogate." 517 U.S. at —— ——, 116 S.Ct. at 1123–1124. In so finding, the Court noted that nearly every other court that was confronted with the issue found that Congress had provided a clear statement of its intent to abrogate. *See id.* Significantly, the Court focused on the fact that the act contained "numerous references to the 'State' in the text of [the Indian Gaming Regulatory Act] mak[ing] it indubitable that Congress intended through the Act to abrogate the States' sovereign immunity from suit." *Id.* at ——, 116 S.Ct. at 1124.

---

**1.** It is undisputed that OMRDD and DCS are agencies of the State of New York. *See Pazamickas v. New York State Office of Mental Retardation and Dev. Disabilities,* 963 F.Supp. 190, 197 (N.D.N.Y.1997).

**2.** For brevity, the references contained herein to "state" shall also be construed as references to a state's agencies or its subdivisions.

Congress enacted the ADEA in 1967 to, *inter alia,* promote the employment of older persons based upon merit and to prohibit arbitrary age discrimination. *See, e.g., Equal Employment Opportunity Comm'n v. Elrod,* 674 F.2d 601, 604 (7th Cir.1982) (*"Elrod"*). When originally enacted, the Act applied only to private sector employers and thus there was no issue with respect to whether Congress intended to abrogate the states' immunity. *Id.* In 1974, Congress amended the ADEA to include the states and their subdivisions within its scope. *Id.* In the 1974 Amendments, the definition of employer was expanded to include "a State or political subdivision of a State or any instrumentality of a State." 29 U.S.C. § 630(b)(2); Fair Labor Standards Act ("FLSA") Amendments of 1974, Pub.L. No. 93–259. § 28, 88 Stat. 74 (amending 29 U.S.C. § 630). This language evinces an unmistakably clear intent on the part of Congress to abrogate the states' immunity. There is no other reasonable interpretation of § 630. Moreover, other courts addressing this issue have reached the same conclusion. See *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 695 (3d Cir.1996) ("The statute simply leaves no room to dispute whether states and state agencies are included among the class of potential defendants when sued under the ADEA for their actions as 'employers.'"); *Davidson v. Board of Governors,* 920 F.2d 441, 443 (7th Cir.1990) (Congress "could not have made its desire to override the states' sovereign immunity clearer."); *Ramirez v. Puerto Rico Fire Serv.,* 715 F.2d 694, 701 (1st Cir.1983) ("[T]he ADEA's express authorization for the maintenance of suits against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated."); *cf. Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 2404, 115 L.Ed.2d 410 (1991) ("The ADEA plainly covers all state employees except those excluded by one of the exceptions."); *Equal Employment Opportunity Comm'n v. Wyoming,* 460 U.S. 226, 233, 103 S.Ct. 1054, 1059, 75 L.Ed.2d 18 (1983) (*"Wyoming"*) ("In 1974, Congress extended the substantive prohibitions of the [ADEA] ... to ... State Governments."). Accordingly, the court concludes that the first prong of the inquiry is answered in the affirmative with respect to the amendments to the ADEA because Congress clearly expressed its intent to abrogate the states' immunity.

### b. *Power to Abrogate*

■ Turning to the second prong of the inquiry, the court must examine whether Congress, in abrogating the states' sovereign immunity when amending the ADEA, did so under a valid exercise of its power. *See Seminole Tribe,* 517 U.S. at 56, 116 S.Ct. at 1124. Prior to *Seminole Tribe,* two sources of power to abrogate the states' sovereign immunity were recognized under the Constitution: the Fourteenth Amendment and the Interstate Commerce Clause. *Id.* at 58, 116 S.Ct. at 1125; *see Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–456, 96 S.Ct. 2666, 2669–2671, 49 L.Ed.2d 614 (1976) (Court held that through the Fourteenth Amendment federal power extended to intrude upon the province of the Eleventh Amendment and, therefore, § 5 of the Fourteenth Amendment permitted Congress to abrogate the immunity from suit guaranteed by that Amendment); *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 19–20, 109 S.Ct. 2273, 2284, 105 L.Ed.2d 1 (1989) (*"Union Gas"*) (plurality of Court found that the Commerce Clause granted Congress the power to abrogate state sovereign immunity because the power to regulate interstate commerce would be "incomplete without the authority to render States liable in damages."). However, the Court in *Seminole Tribe* eliminated the Commerce Clause as a valid exercise of power for Congress to abrogate the states' sovereign immunity when it expressly overruled the plurality decision in *Union Gas. Seminole Tribe,* 517 U.S. at 63, 116 S.Ct. at 1128. Accordingly, the only remaining authority for Congress to abrogate the states' immunity is through § 5 of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer,* 427 U.S. at 452–456, 96 S.Ct. at 2669–2671.

Thus, the court's inquiry here is narrowed to whether Congress enacted the amendments to the ADEA pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. The Supreme Court

has not confronted this issue. *See Wyoming*, 460 U.S. at 243, 103 S.Ct. at 1064 (Court expressly left open the issue of whether the ADEA was also a valid exercise of power under the Fourteenth Amendment). Circuit Courts of Appeals, however, have confronted the issue—both prior to and subsequent to *Seminole Tribe*—and, in general, have concluded that the ADEA was amended pursuant to Congress' Fourteenth Amendment powers. *See Hurd v. Pittsburg State University.* 109 F.3d 1540 (10th Cir.1997); *Blanciak v. Allegheny Ludlum Corp.* 77 F.3d 690 (3d Cir.1996); *Bell v. Purdue University,* 975 F.2d 422 (7th Cir.1992); *Santiago v. New York State Dep't of Correctional Servs.* 945 F.2d 25, 31 (2d Cir.1991) (in dicta, court set forth that "[a]cting under § 5 [of the Fourteenth Amendment], Congress has repeatedly enacted legislation that has clearly stated Congress' intention to abrogate states' immunity," citing the ADEA as one example); *Ramirez v. Puerto Rico Fire Srvc.,* 715 F.2d 694 (1st Cir.1983); *Arritt v. Grisell,* 567 F.2d 1267 (4th Cir.1977). Moreover, numerous district courts that have addressed this issue since *Seminole Tribe* have reached the same conclusion, including at least one district court within the Second Circuit. *See Hodgson v. University of Texas Medical Branch at Galveston,* 953 F.Supp. 168 (S.D.Tex. 1997); *Teichgraeber v. Memorial Union Corp. of Emporia State Univ.,* 946 F.Supp. 900 (D.Kan.1996); *Ullman v. The Rector & Visitors of Univ. of Va.,* No. Civ. A. 96–0002–C, 1997 WL 134557 (W.D.Va. Mar.12, 1997); *Young v. University of Kan. Med. Ctr.,* No. Civ. A. 96–2390–KHV, 1997 WL 150051 (D.Kan. Feb.26, 1997); *see also Pietraszewski v. Buffalo State College,* No. 97–CV–0129E(F), 1997 WL 436763, (W.D.N.Y. Aug.1, 1997); *but see Bechtel v. New York State Banking Dep't,* No. 92–CV–182S, 1997 WL 667784, (W.D.N.Y. Oct.14, 1997) (ADEA claim dismissed for lack of subject matter jurisdiction); *Humenansky v. Board of Regents of the Univ. of Minn.,* 958 F.Supp. 439 (D.Minn.1997) (ADEA claim against state university dismissed as barred by Eleventh Amendment); *MacPherson v. Univ. of Montevallo,* 938 F.Supp. 785 (N.D.Ala.1996) (same); *see, e.g., Farkas v. New York State Dep't of Health,* 554 F.Supp. 24 (N.D.N.Y.

1982) (in a pre-*Seminole Tribe* case, court held 1974 Amendments to the ADEA were not enacted pursuant to Fourteenth Amendment power). Defendants have acknowledged this formidable authority but respond with a several arguments. The court has carefully considered each of these arguments and addresses the significant points raised by defendants.

First, defendants urge the court to find that Congress did not amend the ADEA pursuant to the Fourteenth Amendment because the legislative history to the 1974 Amendments does not reveal that Congress was acting pursuant to its Fourteenth Amendment power. *See* Defendants' Supplemental Memorandum, Dkt. 59, ("Def.Supp.Mem.") at 10 ("Thus, all of the ADEA-'s history derives from Congress' exercise of its Commerce Clause power; this history contains no reference to the Fourteenth Amendment.") at 11–12 ("[t]o conclude that the 1974 Amendments to the ADEA reflect an exercise of Congress' Fourteenth Amendment power, this Court must ignore what Congress expressly stated (interstate commerce concerns) and infer something it did not state (equal protection concerns)"). Defendants also argue that the amendments could not have been passed pursuant to the Fourteenth Amendment because "the ADEA does not protect rights secured by the equal protection clause." Def. Supp.Mem. at 14. Finally, defendants argue that the amendments to the ADEA were passed as part of the amendments to the FLSA, which were passed pursuant to the Commerce Clause, and therefore the amendments to the ADEA also must have been passed pursuant to the Commerce Clause. *See* Def.Supp.Mem. at 9–10.

Defendants' arguments do not sway this court to rebuff the compelling line of authority that holds that the amendments to the ADEA were a legitimate exercise of Congress' power under § 5 of the Fourteenth Amendment. Regarding the legislative history to the 1974 Amendments, the court first turns to defendants' argument that the history contains no reference to the Fourteenth Amendment and therefore Congress could not have been acting pursuant to the Four-

teenth Amendment. This argument is countered by the Supreme Court's finding that Congress need not explicitly refer to the power under which it enacts legislation. *See Wyoming,* 460 U.S. at 243, 103 S.Ct. at 1064. (Congress need not "anywhere recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection,' for '[t]he constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.'") (citing *Fullilove v. Klutznick,* 448 U.S. 448, 476–478, 100 S.Ct. 2758, 2773–2774, 65 L.Ed.2d 902 (1980) (Burger, C.J.); *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948)). Thus, the fact that Congress did not expressly refer to § 5 or the Fourteenth Amendment is not determinative of the powers under which it acted. *See Ramirez,* 715 F.2d at 698 ("the omission of any ritualistic incantation of powers by the Congress is not determinative, for there is no requirement that the statute incorporate buzz words such as 'Fourteenth Amendment' or 'section 5' or 'equal protection.'"); *see also Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 840 (6th Cir.1997) (in context of examining the constitutionality of the Equal Pay Act subsequent to *Seminole Tribe,* court rejected argument that the constitutionality of action taken by Congress depends on a recitation of its power because Congress need not articulate the basis or bases upon which its power is being exercised).

Turning to defendants' argument that the legislative history of the 1974 Amendments do not reveal equal protection concerns, the court finds defendants' position untenable. An examination of the history, albeit sparse, leads the court to follow other courts in their conclusion that the amendments do address equal protection concerns. In *Elrod,* the Seventh Circuit, after an extensive review of the legislative history of the ADEA and its amendments, held that, "the 1974 amendment is 'appropriate legislation' under § 5 of the Fourteenth Amendment" and that "the legislative history is plain that the purpose of the 1974 amendment to the ADEA is to proscribe conduct by state and local governments which violates the guarantee of equal protection under the law." 674 F.2d at 605, 609. Furthermore, other courts to consider the issue have determined that the 1974 Amendments protected rights secured by the equal protection clause. *See Hurd v. Pittsburg State University,* 109 F.3d at 1546 ("the legislative history of the 1974 amendments to the ADEA reflects a purpose consistent with the Fourteenth Amendment"); *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d at 695.

Equally unavailing is defendants' argument that the amendments to the ADEA were passed as part of the larger amendments to the FLSA, and therefore, must have been passed pursuant to the Commerce Clause. While this argument gives the court some pause, its persuasiveness is diminished upon close scrutiny of the circumstances surrounding the passage of the ADEA amendments. In *Elrod,* the court found the fact that the ADEA amendments were passed as part of the larger amendments to the FLSA insignificant. See 674 F.2d at 604–605. In its analysis, the court noted that the ADEA amendments were first introduced, independent of the FLSA amendments, in March 1972 and then again in May 1972 by then Senator Lloyd Bentsen.[3] *Id.* This fact—that the 1974 Amendments were initially introduced independent of the amendments to the FLSA—seriously undermines the significance that can be attached to its connection two years later when the amendments were ultimately passed. Additionally, when the amendments were originally proposed, Senator Bentsen urged support of the ADEA amendments because the principles underlying the Title VII amendments, which were clearly equal protection concerns, "are directly applicable to the Age Discrimination in Employment Act." *Id.;* 118 Cong.Rec. 15895 (1972). While the originally proposed amendments to the ADEA were unanimously passed by the Senate, they stalled in the House–Senate conference committees after being attached

---

**3.** Also in March 1972, Congress considered and passed the amendments to Title VII (also extending coverage to state and local government employees) which were explicitly passed pursuant to § 5 of the Fourteenth Amendment. *See* H.R.Rep. No. 92–238, 92d Cong., 2d Sess.; 1972 U.S.Code Cong. & Ad. News 2137, 2154.

to two bills. *See id.;* S.Rep. No. 93–690, 93d Cong., 2d Sess. 55 (1974); 120 Cong. Rec. 8768 (1974). Ultimately, the amendments were passed with the amendments to the FLSA and little legislative history exists "because the breadth and significance of the amendments to the FLSA overshadowed the ADEA amendment." *Elrod,* 674 F.2d at 605. After examining the circumstances of the passage of the amendments to the ADEA, the court in *Elrod* concluded that "the 1974 amendment to the ADEA was firmly within the ambit of congressional authority under § 5 of the Fourteenth Amendment, and that the connection of the ADEA amendment to the legislation enacting FLSA amendments was largely *fortuitous.*" *Id.* at 610 (emphasis added). After reviewing this legislative history and the circumstances surrounding the passage of the 1974 Amendments with the FLSA, the court agrees with the existing authority and finds the connection between the 1974 Amendments and the FLSA insignificant.[4]

The court concludes that, notwithstanding defendants' arguments, the second prong of the inquiry is also answered in the affirmative because Congress was acting pursuant to a valid exercise of power when amending the ADEA. Therefore, Congress properly waived the states' sovereign immunity and the court maintains subject matter jurisdiction with respect to plaintiffs' federal law claims. *See Seminole Tribe,* 517 U.S. at 54, 116 S.Ct. at 1123.

### 2. *State Law Claims*

 Having considered its jurisdiction over plaintiffs' federal law claims, the court next considers whether it has jurisdiction over plaintiffs' state law claims. Plaintiffs' fifth cause of action asserts state law claims pursuant to the HRL. As set forth, the Eleventh Amendment bars federal court jurisdiction over claims asserted against the state by its citizens, including pendent state law claims, unless the state has consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 120–121, 104 S.Ct. at

918–919. The state may waive its Eleventh Amendment immunity only by "the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *See Edelman v. Jordan,* 415 U.S. at 673, 94 S.Ct. at 1361. Here, the state has not waived its immunity, and plaintiffs do not argue that it did, with respect to the HRL. *See Pazamickas v. New York State Office of Mental Retardation and Dev. Disabilities,* 963 F.Supp. 190, 197 (N.D.N.Y.1997); *Jungels v. State Univ. College of New York,* 922 F.Supp. 779, 784 (W.D.N.Y.1996) (court dismissed claims under the HRL against state defendant pursuant to the Eleventh Amendment finding that there "is no basis for finding such a waiver in the text of the HRL."), *aff'd sub nom., Jungels v. Jones,* 112 F.3d 504 (2d Cir.1997). Therefore, the court lacks subject matter jurisdiction over plaintiffs' HRL claims. *See Cassells v. University Hosp. at Stony Brook,* 740 F.Supp. 143, 147–148 (E.D.N.Y.1990) (plaintiff's claim under HRL dismissed for lack of subject matter jurisdiction because state defendant was entitled to Eleventh Amendment immunity). Consequently, plaintiffs' state law claims must be dismissed.

To summarize, the court maintains jurisdiction to entertain plaintiffs' federal claims pursuant to the ADEA because it finds that Congress validly waived the states' sovereign immunity when it enacted the amendments to the ADEA. However, the court is without jurisdiction to entertain plaintiffs' state court claims because defendants did not consent to suit in this court, nor did they waive their immunity. The court now turns to defendants' summary judgment motion.

### B. *Plaintiffs' ADEA Claims*

#### 1. *Motion to Dismiss and Discovery Dispute*

 As a preliminary matter, and in connection with defendants' summary judgment motion, the court addresses the parties' discovery dispute and defendants' related motions. Defendants move to dismiss the

---

**4.** Though *Elrod* was pre-*Seminole Tribe,* there is nothing in *Seminole Tribe* that disturbs its holding or the analysis in support thereof.

claims of seven members of the plaintiff class for the alleged failure to respond to defendants' interrogatories.[5] In the alternative, defendants move to preclude the identified plaintiffs from introducing any factual evidence of age discrimination and to strike the submitted affidavits on this motion for summary judgment from the record. Additionally, defendants seek costs and attorneys' fees in connection with this motion, as well as an order reopening discovery to allow defendants to depose the identified members of the class who submitted affidavits containing factual allegations of age discrimination.

This dispute and defendants' related motions stem from plaintiffs' alleged failure to respond to defendants' interrogatory number four (the "Interrogatory").[6] Defendants assert that all but two of the plaintiffs failed to answer the Interrogatory, and specifically, none of the individuals that submitted affidavits in opposition to the instant motion for summary judgment answered the Interrogatory in any manner. *See* Siegfried Aff. at ¶¶ 5, 8. Defendants therefore request that the court dismiss the claims of each plaintiff who failed to respond. *Id.* at ¶ 11. As rationale for their position, defendants claim plaintiffs misled them as to what they would be defending against by failing to respond to the Interrogatory.

Plaintiffs respond that defendants' position lacks merit for several reasons. First, and significantly, plaintiffs assert that "[p]laintiffs did, in fact, provide the defendants, in their prior interrogatory responses, with precisely the type of information that was called for by the said Interrogatory No. 4." Surreply Affidavit of Leonard N. Flamm, Dkt. 56, ("Flamm Surreply Aff.") at ¶ 4. Apparently, the parties are in disagreement as to the interpretation of the Interrogatory and the type of response that it required. Plaintiffs read the Interrogatory as a "contention" interrogatory—as opposed to an "identifica-

tion" interrogatory—and therefore claim that specific factual responses were not required. *Id.* at ¶¶ 5–7; *see* Fed.R.Civ.P. 33(c); 7 James Wm. Moore et al., Moore's Federal Practice § 33.02[2] (3d ed.1997) (noting the distinction between identification and contention interrogatories, contention interrogatories are described as inquiring into an opinion or contention that relates to fact or the application of law to fact).

Plaintiffs argue that on this motion for summary judgment, defendants are now claiming that the Interrogatory was intended to encompass a lot more than merely seeking plaintiffs' contentions—it requires each opt-in plaintiff to set forth each and every factual matter, anecdote, and statement bearing upon the plaintiffs' collective and individual proofs which support their claim. Plaintiffs assert that, generally, members of an opt-in class are not required to provide individual responses to a defendant's discovery demands, citing *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1556 (11th Cir.1986) (individual discovery directed to passive class members would normally be appropriate only at the later stages of the suit).

Second, plaintiffs respond that because their responses to the Interrogatory were general in nature, defendants were plainly put on notice as to plaintiffs' interpretation of the Interrogatory. Thus, plaintiffs contend, if defendants disagreed with plaintiffs' interpretation, they should have objected at the time plaintiffs served their answers. Plaintiffs point out that defendants did not object to plaintiffs' responses nor did they seek further information or request additional details.

Third, plaintiffs respond that the responsibility for any misinterpretation or ambiguities must lie with defendants as the proponents of the Interrogatory. Plaintiffs argue that defendants were aware that plaintiffs interpreted the Interrogatory as a contention

---

**5.** The seven members of the class who defendants claim failed to adequately respond to their discovery request include the following plaintiffs: Mete, Gottlieb, Slosberg, Slawinski, Moskowitz, Davis, and Cicero. Of these plaintiffs, defendants contend that Cicero and Slawinskin failed to respond at all to the discovery demands.

**6.** The Interrogatory provided:
With respect to each member of the plaintiffs' class, state with particularity the legal and factual basis for the claim that the reduction in force that resulted in the elimination of the Chief of Service, which occurred in September, 1989, was motivated by age discrimination.

interrogatory and then never clarified the matter.

Finally, plaintiffs point out that defendants have not raised their concern or objection in accordance with the Local Rules of the Northern District of New York. Therefore, plaintiffs argue, defendants motion should be denied on that ground alone.

After careful review of all of the parties' arguments, the court will consider plaintiffs' affidavits on this motion. While the court need not decide whether the Interrogatory is a contention or an identification interrogatory, it is satisfied that there exists a legitimate disagreement between the parties as to the nature of the information sought by the Interrogatory. Additionally, the court fails to find even a specter of bad faith by plaintiffs' counsel.

Fault must lie with defendants as proponents of the Interrogatory. The court's review of the Interrogatory leaves it with the opinion that the Interrogatory could have been more narrowly drafted to elicit the response to which defendants now contend they were entitled. For example, defendants could have specifically requested any age based statements made, the maker of any such statements, the time and place of the statements, and any witnesses to any such statements. While it is true that defendants may not have known that there were going to be specific factual allegations of age discrimination and thus they are now surprised, the responsibility for defendants' surprise cannot fall on plaintiffs. As the plaintiffs point out, defendants never made a motion to compel answers to the interrogatories or expressed to the court their dissatisfaction with the propriety of the answers. Thus, there is no basis to now seek sanctions against plaintiffs, let alone dismissal of their claims. Accordingly, the court denies defendants' motions.

### 2. Motion for Summary Judgment

The court now turns to the merits of defendants' motion for summary judgment. Summary judgment is proper only where the court determines there exists no genuine issue of material fact when viewing the evidence in a light most favorable to the non-movant. See Fed.R.Civ.P. 56(c). On a motion for summary judgment, the court is to draw all reasonable inferences and resolve all ambiguities in favor of the non-movant. Summary judgment in favor of the defendants is inappropriate if, in view of the entire record, a rationale jury could find in favor of the plaintiffs. See Binder v. Long Island Lighting Co., 933 F.2d 187, 191 (2d Cir.1991).

In cases of employment discrimination where the employer's intent is at issue, district courts are required to proceed with caution when evaluating a summary judgment motion. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, the "salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985).

#### a. Disparate Treatment

Plaintiffs claim that defendants' RIF was an unlawful attempt by defendants to terminate or demote them based upon their age. Thus, plaintiffs' first claim pursuant to the ADEA is based upon the theory of disparate treatment.

The ADEA protects employees over 40 years of age from adverse employment action by reason of their age. See 29 U.S.C. §§ 621, 623. It does not, however, prohibit an employer from taking adverse action against a protected employee based upon non-discriminatory factors. See id.; Haskell v. Kaman Corp., 743 F.2d 113 (2d Cir.1984). Further, employers are not required to show justifiable cause for their employment decision, nor are they required to show that the employment decision was sound or wise. Cf. Parcinski v. Outlet Co., 673 F.2d 34, 36–37 (2d Cir.1982) (the ADEA does not authorize the courts to "judge the wisdom of a corporation's business decisions."). The plaintiff in an ADEA case bears the ultimate burden to demonstrate that the employment decision was motivated by plaintiff's age. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

Absent direct evidence of age discrimination, a plaintiff may prove his disparate treatment claim through circumstantial evidence from which an inference of age discrimination may be drawn by utilizing the well-known three-step burden shifting analysis developed in the employment discrimination context by *McDonnell Douglas* and *Burdine. See Gallo,* 22 F.3d at 1224 ("Because [plaintiff] alleges disparate treatment, we employ the familiar three-step burden shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), which applies to ADEA cases.").

In an employment discrimination case, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *See Burdine,* 450 U.S. at 252–253, 101 S.Ct. at 1093; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–2747, 125 L.Ed.2d 407 (1993). The establishment of a prima facie case " 'in effect creates a presumption that the employer unlawfully discriminated against the employee.' " *St. Mary's Honor Center,* 509 U.S. at 506, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094).

Upon establishing a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. *See, e.g., O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 309–311, 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 38 (2d Cir.1994). The burden on the defendant at this phase is one of production rather than persuasion. *See, e.g., St. Mary's Honor Center,* 509 U.S. at 506–507, 113 S.Ct. at 2747. If the defendant satisfies this burden of production, it becomes incumbent upon the plaintiff to show that the defendant's articulated reason for its employment decision is a pretext for discrimination and that the real reason for the employment decision was the defendant's discrimination. *See St. Mary's Honor Center,* 509 U.S. at 507–508, 113 S.Ct. at 2749,

2751–2753; *Viola v. Philips Med. Sys.,* 42 F.3d 712, 717 (2d Cir.1994).

### 1. *Prima Facie Case*

 In this class action, plaintiffs may make out a prima facie case of age discrimination under *McDonnell Douglas* by showing that (1) they were each within the protected class, (2) they were qualified for their positions, (3) they were discharged or suffered from an adverse employment decision, and (4) the discharge or adverse employment decision occurred under circumstances giving rise to an inference of discrimination. *See Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994). In a "reduction-in-force case or a structural reorganization case, a discharged employee who seeks under *McDonnell Douglas* to establish a prima facie case need not show that he was replaced by a younger, newly hired employee; it is sufficient that the discharge occur in circumstances giving rise to an inference of age discrimination." *Montana v. First Federal Savings & Loan Ass'n,* 869 F.2d 100, 105 (2d Cir.1989). The showing required of plaintiffs at this stage to survive summary judgement is "de minimis." *E.G., Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203–204 (2d Cir.1995).

 The first three elements are undisputed by defendants. At the time of the RIF all Chiefs were over the age of 40, they were qualified for their positions, and they were affected by an adverse employment decision. Defendants focus the thrust of their argument on the fourth element—that the RIF occurred under circumstances giving rise to an inference of age discrimination. *See* Defendants' Memorandum, Dkt. 37, ("Def.Mem.") at 8, 13 ("Despite the fact that plaintiffs fall within the age class protected by the ADEA and were adversely affected by the reduction-in-force, they lack direct or circumstantial evidence necessary to show an inference of age discrimination.")

Plaintiffs counter with several arguments contending that the record clearly demonstrates that they have met their de minimis burden. In support, they advance statistical evidence as well as circumstantial evidence to meet their burden. In terms of statistical evidence, plaintiffs assert that OMRDD em-

ployees age 40 or over were approximately three times as likely to be adversely affected by the RIF as those under the age of 40.[7] With respect to the other circumstantial evidence relied upon by plaintiffs, plaintiffs contend that defendants' claim that the Chiefs' duties were outmoded is belied by the fact that the very same duties were reassigned to other employees after the RIF. Plaintiffs point out that defendants' asserted claim that they were faced with a budgetary shortfall warranting the elimination of the Chiefs is controverted by the evidence contained in the record. Plaintiffs additionally assert that the record demonstrates that no study was conducted to determine the impact on over age 40 employees prior to the RIF nor was there any procedure in place to assure that the RIF was carried out in a non-discriminatory manner. This evidence, plaintiffs contend, demonstrates that they have met their burden of establishing a prima facie case. Defendants dispute this evidence and the inferences plaintiffs draw from it. The court, however, finds that drawing all reasonable inferences in favor of plaintiffs and viewing the facts in a light most favorable to them, plaintiffs have established their prima facie case of age discrimination. *See, e.g., Cronin,* 46 F.3d at 203–204.

### 2. *Defendants' Legitimate Business Justification*

■ As a result of plaintiffs establishing their prima facie case, the burden now shifts to defendants to articulate a legitimate non-discriminatory reason for their employment decision. *See Chambers,* 43 F.3d at 38. As noted, this burden is one of production, not persuasion. *See St. Mary's Honor Ctr.,* 509 U.S. at 506–507, 113 S.Ct. at 2747. In support of their motion, defendants have submitted affidavits setting forth the background and circumstances surrounding the RIF. It is well established that a RIF constitutes a legitimate, non-discriminatory reason for an employer's adverse employment decision. *See Cronin,* 46 F.3d at 202. Accordingly, the court finds that defendants have satisfied their burden of production and have adequately rebutted plaintiffs' presumption of

age discrimination that was established by plaintiffs' prima facie case. *See, e.g., St. Mary's Honor Ctr.,* 509 U.S. at 506–508, 113 S.Ct. at 2747.

### 3. *Pretext and Discrimination*

■ As a result of defendants articulating a non-discriminatory reason for their employment action, the burden shifts back to plaintiffs. The court's factual inquiry proceeds to a new level of specificity requiring plaintiffs to show that there exists a genuine issue of fact as to whether defendants' business justification is false and also, that it is more likely than not that the real reason for defendants' employment action was plaintiffs' age. *See Viola,* 42 F.3d at 717; *Woroski,* 31 F.3d at 110.

■ Plaintiffs again advance several arguments to support their position that the RIF was pretextual. In many respects, the arguments, and evidence relied upon in support thereof, are similar to that advanced by plaintiffs to establish their prima facie case. While the plaintiffs' ultimate burden may be satisfied by the presentation of additional evidence to show that the employer's justification is incredible, that burden "may often be carried by reliance on the evidence compromising the prima facie case, without more." *Cronin,* 46 F.3d at 202 (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *St. Mary's Honor Center,* 509 U.S. at 508, 113 S.Ct. at 2749; *Gallo,* 22 F.3d at 1226).

Plaintiffs first focus on the rationale advanced by defendants for implementing the RIF to demonstrate that the RIF was a pretext for age discrimination. If plaintiffs can prove at trial that the reasons advanced by defendants for the RIF are not worthy of belief, the fact finder could disbelieve defendants' proffered reason and, thus, find that the real reason was age discrimination. For purposes of this summary judgment motion, however, plaintiffs need only demonstrate that a genuine issue of material fact exists with respect to whether defendants' proffered explanation is pretextual.

---

7. The court considers this statistical evidence as additional circumstantial evidence of plaintiffs' prima facie case in their disparate treatment cause of action.

In support of their position that defendants' proffered reason for the RIF is unworthy of belief, plaintiffs advance several arguments. Plaintiffs attack defendants' position that the RIF was precipitated by a severe budgetary crisis, which warranted the elimination of the Chiefs. *See* Webb Aff. at ¶¶ 2, 8. Defendants have offered evidence that the 1989–1990 Executive Budget for the State of New York anticipated a need for the elimination of approximately 260 positions in OMRDD. *See* Webb Aff. at ¶ 3. In addition, defendants assert that "[a]dditional personal service cuts enacted by the Legislature expanded the number of positions which needed to be eliminated" and that "Legislative adjustments to the 1989–1990 fiscal year appropriations for OMRDD cut more than 9.1 million dollars in state purposes personal services resources" thereby necessitating the elimination of the Chiefs. *See id.* Defendants further assert that as a result of the 1981 task force study and the 1985 earmarking of the Chiefs, the elimination of that position was logical.

Plaintiffs first dispute the interpretation of the task force study and the 1985 earmarking as well as its connection eight years later to the RIF. With respect to the task force study, plaintiffs assert that defendants' purported reliance on the 1981 study as the basis for the 1985 earmarking is fallacious. Plaintiffs point out that the report merely concludes that the Chiefs were overcompensated for the duties actually performed and that the report recommended that the Chiefs' position be reclassified and they be given greater responsibility. *See* McChesney Aff., Exh. "1," at p. 36 (1981 task force study). Plaintiffs further point out that the 1981 report makes no mention or hint of eliminating the Chiefs, but rather, stresses the importance of retaining the Chiefs within the management structure. *See* McChesney Aff., Exh. "1."

With respect to the 1985 earmarking, plaintiffs also dispute defendants' interpretation that it identified the Chiefs for termination and thus served as the basis for their eventual elimination. *See* Webb Aff. at ¶ 9. Plaintiffs point out that the earmarking had nothing to do with budgetary concerns, but

merely was implemented to assure that the existing Chiefs were efficiently utilized before additional Chiefs were employed. *See* Affidavit of Leonard N. Flamm, attached to Dkt. 46, ("Flamm Aff."), Exh. "10," (earmark notice). While the earmark notice does reference that the earmarked title of Chief is to be re-classified, the document sets forth that no earmarked positions may be filled pending review of the earmarking agency. *See id.* This raises a question as to whether the earmark meant that the Chiefs were earmarked for elimination, as defendants contend, or whether it placed a hiring freeze on the re-classified Chiefs, as plaintiffs contend. *See id.* In any event, neither the task force study nor the earmarking reference budgetary concerns, the principal reason given by defendants for the RIF.

After attacking defendants' reliance on the task force study and the earmarking as the basis for eliminating the Chiefs, plaintiffs turn to the financial crisis itself and raise questions regarding its validity as a basis for the RIF. Plaintiffs have submitted letters from three New York State senators raising an issue as to the trustworthiness of the state budget as a basis for the RIF. *See* Flamm Aff. at Exh. "15" (letter from Senator Nicholas A. Spano to Barbara Zaron), Exh. "16" (letter from Senator Michael J. Tully, Jr. to Commissioner Webb), and Exh. "17" (letter from Senator Nancy Larraine Hoffmann to Barbara Zaron). In each of these letters, the senators dispute that the New York Legislature mandated budget cuts that would necessitate the elimination of the Chiefs. For instance, Senator Spano, Chairman of the Senate Mental Hygiene Committee, set forth in his letter that "In his 'Reduction in Force' layoff plan, Commissioner Webb has totally disregarded the provisions of the enacted 1989–90 New York State Budget" and that the "proposal by [OMRDD] to eliminate the Chiefs of Service and Developmental Service Manager titles also disregards the agreements made in this year's State Budget." *See* Flamm Aff. at Exh. "15." Senator Tully, the Chairman of the Senate Health Committee, in his letter to Commissioner Webb opposing the proposed layoffs of the Chiefs, wrote "the legislature felt when the budget was passed that there were sufficient funds

to avert the layoffs of these positions" and that "it appears that you are attempting to eliminate these titles, which you have tried to do in the past, under the guise of a supposed agreement between the Legislature and Executive" and that "[n]o such agreement ever existed." *See* Flamm Aff. at Exh. "16." Senator Hoffmann, a member of the Senate Finance Committee, wrote:

> I supported efforts during the budget process which I believed had eliminated the need for OMRDD layoffs. The legislature adjourned in the belief that the restorations to that department's budget had put an end to the probability of layoffs for this year. It is interesting to note that OMRDD timed its announcement of the layoffs so that the legislature is not scheduled to be in session prior to the time they will take effect. This prevents the legislature from having an opportunity to respond to the actions of a department in the executive branch.

*See* Flamm Aff. at Exh. "17." These letters clearly raise a question as to the trustworthiness of defendants' proffered explanation that OMRDD's elimination of the Chiefs was necessitated by budgetary constraints.

▬ Defendants argue that these are hearsay letters written in response to complaints by constituents and that these politicians "are not charged with the responsibility of the operation of OMRDD and certainly have a vested interest in opposing actions that might adversely affect their constituents." *See* Defendants' Reply Memorandum, Dkt. 51, ("Def.Reply Mem.") at 5. Defendants' arguments are unavailing. Even assuming that the letters are hearsay, the court may consider evidence on a motion for summary judgment that is not in the form that would be admissible at trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (party opposing motion need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment"). Hearsay may be considered on a motion for summary judgment "if the information is corroborated or sufficiently reliable." *DiMarco v. Rome Hosp. & Murphy Memorial Hosp.,* 899 F.Supp. 91 (N.D.N.Y.

1995) (unauthenticated letter containing hearsay considered by the court on a motion for summary judgment where declarant would be available at trial) (citing *Carney v. United States Dep't of Justice,* 19 F.3d 807, 813 (2d Cir.1994) (affidavit replete with hearsay inadmissible unless it contains some corroborating factual support, such as the names of those interviewed); *United States v. Property Located at 15 Black Ledge Drive,* 897 F.2d 97, 101–102 (2d Cir.1990) (hearsay from confidential informant could be considered on a motion for summary judgment on the issue of probable cause, in part, because the court determined such hearsay to be reliable)); *see also United States v. Private Sanitation Industry Assoc.,* 862 F.Supp. 861 (E.D.N.Y.1994) (court considered memorandum arguably containing hearsay on motion for summary judgment because it concluded that it contained "evidence potentially admissible at trial") (citing *Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33, 38 (D.C.Cir. 1987) (Court of Appeals held district court could consider letter from non-party to another non-party, even if inadmissible, because the substance of the letter is ultimately reducible to admissible form through third-party's projected appearance as a witness at trial); *Tatum v. Cordis Corp.,* 758 F.Supp. 457, 463 (M.D.Tenn.1991) (a court may consider hearsay evidence in opposition to summary judgment if the out-of-court declarant would be available at trial to present the evidence through direct testimony)). The court will consider the letters inasmuch as any alleged deficiency as to their admissibility can be easily cured by plaintiffs (for example, plaintiffs can, if they choose, call each of the senators as a witness at the trial of this action). Furthermore, the court finds the letters reliable. They are written by reputable New York State senators to non-parties, near in time to the RIF, and years before the commencement of this action.

Defendants' argument that the senators are biased or that the letters were written as a result of a motive is equally unavailing. Even assuming that defendants are correct, such arguments go to the weight afforded the documents by the trier of fact. The court cannot discredit these letters on the basis of any alleged motive on the part of the

senators on this motion for summary judgment.

With respect to defendants' argument that these politicians are not charged with the responsibility of the operation of OMRDD, that argument is belied by Commission Webb's testimony given during his deposition. In response to a question as to whether he had input into the RIF, Commissioner Webb testified that "the answer is, yes, the final decision always had to be either mine and/or the legislature, depending upon who made, you know, the final decisions on these." *See* Deposition Transcript of Arthur Y. Webb, ("Webb Tr.") attached to Flamm Aff. as Exh. "2." It thus appears that the final decisions with respect to OMRDD, depending on the issue, were either Commissioner Webb's or the legislature's. Accordingly, the court rejects defendants' arguments and finds that plaintiffs have raised a triable issue of fact with respect to the legitimacy of defendants' proffered reason for the RIF.

The analysis does not end here. Having raised a question of fact with respect to the legitimacy of the rationale for the RIF, plaintiffs must still come forward with some evidence that would allow a trier of fact to conclude that it is more likely than not that age was a motivating factor in OMRDD's decision to eliminate the Chiefs. *See Viola,* 42 F.3d at 717. At this stage, however, if the trier of fact disbelieved defendants' explanation for the elimination of the Chiefs, it could infer that the reason must have been discrimination. The court, after carefully reviewing the record, concludes that it contains sufficient evidence to allow a trier of fact to conclude it is more likely than not that age was the real reason for the elimination of the Chiefs.

In view of plaintiffs raising a question as to the trustworthiness of defendants' business justification, the statistical evidence proffered by plaintiffs takes on added significance. The statistical analysis conducted by plaintiffs' expert, Dr. Greenberg, shows that of the total 163 OMRDD employees adversely affected by the RIF, 122 or 74.8%, including all the members of the plaintiff class, were age 40 or over. *See* Greenberg Aff. at ¶ 3.

Dr. Greenberg concluded, based on an analysis of these statistics, that "OMRDD employees who were of age 40 or over were approximately three times as likely to suffer deleterious consequences as those who were under the age of 40." Greenberg Aff. at ¶ 8. In order to determine whether the disparity was statistically significant, Dr. Greenberg conducted a chi-square analysis, a generally accepted and appropriate statistical test, with a correction for continuity, and found the value of the chi-square to be 47.22. *See* Greenberg Aff. at ¶¶ 9–10. A chi-square value of zero would be found if the proportions of those who suffered adverse consequences were the same in the two categories, under age 40 and over age 40. *See id.* at ¶ 10. Dr. Greenberg then concluded that "the probability of obtaining a value of chi-square of 47.22 was found to be less than 1 in 100,000." *Id.* at ¶ 10. On the basis of his analysis, Dr. Greenberg was able to conclude that "the results show that the disparity found here is statistically significant, *i.e.,* it was extremely unlikely to have arisen by chance or through the use of any age-neutral criterion." *Id.* at ¶ 11.

In addition to statistical evidence, the record reveals a failure on the part of defendants to provide any specific guidelines in ordering or implementing the RIF. While this, standing alone, is not probative of age discrimination, it could be significant to show that there were no guidelines in place to prevent the age of the employees from becoming a factor in the decision. This is especially true when coupled with evidence that some of those in the decision making process, as well as those who made recommendations in the decision making process, maintained an age based animus against plaintiffs. *See* Flamm Aff. at Exh. "5" (attached affidavits containing allegations of age discrimination).

The evidence produced by plaintiffs indicates that Commissioner Webb maintained an age based animus against plaintiffs. Fiorello Cicero, a former Chief and a member of the plaintiff class in this suit, submitted an affidavit that described a meeting with Commissioner Webb wherein the RIF was discussed. *See* Affidavit of Fiorello Cicero

("Fiorello Aff.") at ¶ 3. attached to Flamm Aff. at Exh. "5." During that meeting, Fiorello attested that Webb stated that his staff persuaded him that the Chiefs needed to be eliminated. *See id.* Fiorello further attested that Webb stated "that OMRDD needed new and younger employees to take over the leadership of the agency as OMRDD moved more strongly into the community." *Id.*

In addition to producing evidence of Commissioner Webb's alleged age based animus,, plaintiffs also proffered evidence with respect to Executive Deputy Commissioner Howe. *See id.* at ¶ 4. As set forth, Howe participated in the RIF and its implementation. *See* Part II, *supra.* Fiorello additionally attested that in a 1990 post-RIF conversation with Deputy Commissioner Howe, Howe justified the RIF by asserting that "OMRDD needed to make room for younger employees to advance in the system, and that with the contraction of staff, OMRDD needed to remove the old guard who was standing in the way of the community movement." *See* Fiorello Aff. at ¶ 4.

In addition to evidence to demonstrate Commissioner Webb and Deputy Commissioner Howe maintained an age based animus, plaintiffs proffered evidence to demonstrate that those who made recommendations with respect to the RIF maintained an aged based animus. Plaintiffs have come forward with evidence that at least two Directors maintained an age based animus against plaintiffs. As noted, Commissioner Webb attested that, when implementing the RIF, he sought a recommendation from each Director based upon a review of the Director's operations. *See* Webb Aff. at ¶ 6. In his affidavit, plaintiff Davis attested that Director McCormack, the Director of the developmental center where Davis worked, repeatedly referred to the Chiefs as "old, lazy and overpaid" and acted "as if they have already 'retired.'" *See* Affidavit of Mark G. Davis ("Davis Aff.") at ¶ 1, attached to Flamm Aff. as Exh. "5." Davis also recalled "numerous conversation with [Director McCormack] in which he referred to the Chiefs as 'dead wood' and that they should be 'fired.'" *See* Davis Aff. at ¶ 6. In addition, Davis attested that Director McCormack was open and blatant with his remarks and that his characterization of the Chiefs was "common knowledge" among the staff. *See id.* at ¶ 4.

Plaintiff Moskowitz attested that Director Robidoux, a Director who apparently made recommendations concerning the RIF, commented to him during a retirement dinner honoring a Chief that this was "one down" and further, that Moskowitz was "old enough to retire" and inquired when he would be retiring. *See* Affidavit of Joseph Moskowitz ("Moskowitz Aff.") at ¶¶ 3, 7, attached to Flamm Aff. as Exh. "5." Moskowitz also attested to a conversation in 1988 with Director Robidoux where Robidoux attempted to discuss with Moskowitz his age and again asked him whether he intended to retire. *Id.* at ¶ 4. During that same conversation. Director Robidoux told Moskowitz that the Chiefs' position required someone who was "younger, had more energy, and was more committed to the goal[s]" of OMRDD. *See id.*

Plaintiff Moskowitz also recounts an incident with Director Robidoux wherein Robidoux attempted to coerce Moskowitz to retire. *See id.* Robidoux suggested that Moskowitz retire and that if he didn't, he would be reassigned to a position of evening administrator. *See id.* Moskowitz refused to retire and was consequently reassigned. *Id.* Moskowitz accepted the position and recounts that on several occasions staff members from the facility informed him that Robidoux often referred to him as "the old man" and made such derogatory statements to the staff members as "how's the old man faring?" and "is he ready to retire yet?" *See id.* at ¶ 5.

Plaintiff Cicero recounts a meeting with Director Wilkowsky wherein the RIF was discussed. *See* Cicero Aff. at ¶ 5. Director Wilkowsky told Cicero that while he did not support the termination of the Chiefs, he had trouble understanding why Cicero would be upset because he was "old enough to retire." *Id.* While Wilkowsky's statement does not necessarily show that an impermissible recommendation was made to Commissioner Webb—because he did not support the RIF—plaintiffs offer the statement to demonstrate the type of attitude that was charac-

teristic of the administration at OMRDD. *See id.*

The statements of these Directors raise a question as to whether Commissioner Webb received impermissible recommendations from them. In fact, Commissioner Webb need not know that the Directors based their recommendations to terminate the Chiefs on impermissible criteria. All that needs to be shown is that Commissioner Webb relied on the impermissible recommendations when implementing the RIF. This would be sufficient to show that age played an impermissible role in the selection of the Chiefs for the RIF. The court finds that, independent of evidence of Commissioner Webb's and Deputy Commissioner Howe's age based animus, evidence that Directors, who made recommendations to Commissioner Webb to terminate the Chiefs, maintained an age based animus raises a significant question as to whether the age of the Chiefs played an impermissible role in the RIF.

To summarize, the court finds that the "cumulative weight of circumstantial evidence" is sufficient to create a genuine issue of material fact as to whether age played an impermissible role in the decision to terminate the Chiefs as part of the RIF. *See Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991). Accordingly, defendants' motion with respect to plaintiffs' claim for disparate treatment is denied.

b. *Disparate Impact*

■ Defendants additionally move for summary judgment on plaintiffs' disparate impact cause of action contending that disparate impact theory is not applicable to ADEA claims since the Supreme Court's decision in *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 617–618, 113 S.Ct. 1701, 1710, 123 L.Ed.2d 338 (1993) ("*Hazen Paper* "). *See* Def.Mem. at 19–21; Def.Reply Mem. at 21–23. As defendants point out, the viability of a disparate impact theory pursuant to the ADEA has been questioned. *See Hazen Paper,* 507 U.S. at 617–618, 113 S.Ct. at 1710 (dicta); *Ellis v. United Airlines Inc.,* 73 F.3d 999 (10th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 2500, 135 L.Ed.2d 191 (1996); *DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719,

732–734 (3d Cir.), *cert. denied,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *Equal Employment Opportunity Comm'n v. Francis W. Parker School,* 41 F.3d 1073 (7th Cir.1994). On the other hand, however, the viability of a disparate impact theory pursuant to the ADEA has been confirmed. *See Graffam v. Scott Paper Co.,* 870 F.Supp. 389, 393–394 (D.Me.1994), *aff'd,* 60 F.3d 809 (1st Cir.1995); *Lyon v. Ohio Education Ass'n & Prof'l Staff Union,* 53 F.3d 135, 139 n. 5 (6th Cir.1995); *Houghton v. SIPCO, Inc.,* 38 F.3d 953, 958 (8th Cir.1994); *Abbott v. Federal Forge, Inc.,* 912 F.2d 867, 872 (6th Cir.1990). The Second Circuit has not addressed the issue since the Supreme Court's decision in *Hazen Paper. See Johnson v. New York,* 49 F.3d 75, 78 (2d Cir.1995) (the "Supreme Court has not decided whether disparate impact theory of liability is available under ADEA"). However, prior to *Hazen Paper,* the Second Circuit held that the disparate impact doctrine is viable under the ADEA. *See Maresco v. Evans Chemetics,* 964 F.2d 106, 115 (2d Cir.1992) ("The disparate impact doctrine, developed under Title VII, is also applicable to cases under the ADEA."); *Lowe v. Commack Union Free School Dist.,* 886 F.2d 1364, 1369 (2d Cir.1989). The *Maresco* decision has not been overruled nor has its rationale been abandoned and "the district courts in this Circuit to reach the issue have followed the Circuit's precedent allowing such a claim." *E.g., Diehl v. Xerox Corporation,* 933 F.Supp. 1157, 1166 (W.D.N.Y. 1996) (citing authority). Thus, the court will allow plaintiffs to go forward with their disparate impact claim. *See, e.g., Diehl,* 933 F.Supp. at 1166 ("Until this Circuit rules otherwise, this Court is bound to follow Second Circuit precedent allowing disparate impact claims under the ADEA."); *Hunt v. Tektronix, Inc.,* 952 F.Supp. 998, 1009 (W.D.N.Y.1997) ("Until the Second Circuit pronounces otherwise, disparate impact claims may be asserted under the ADEA and district courts such as this one must recognize them.").

Disparate impact claims arise from the allegation that a facially neutral employment practice impacts more harshly on a protected group and cannot be justified by business

necessity. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–336, 97 S.Ct. 1843, 1854–1855, 52 L.Ed.2d 396 (1977); *Maresco,* 964 F.2d at 115. Disparate impact claims differ from disparate treatment claims in that disparate impact claims do not require proof of discriminatory motive. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *but cf.* Deborah E. Moore, Note, *Disparate Treatment Versus Disparate Impact: A Distinction Without a Difference,* 41 Syracuse L.Rev. 965, 983 (1991) (noting the distinction between the two theories is "effectively obliterate[d]" because both disparate treatment and disparate impact employees must ultimately "meet the same standard of proof.").

In order to establish a prima facie disparate impact claim under the ADEA, plaintiff must identify a specific employment practice having an adverse impact upon members of the protected class, and then show causation. *See Maresco,* 964 F.2d at 115. "Statistical evidence may be used to establish a disparate-impact claim, provided that it 'reveals a disparity so great that it cannot be accounted for by chance.'" *Renaldi v. Manufacturers & Traders Trust Co.,* 954 F.Supp. 614, 619 (W.D.N.Y.1997) (quoting *Waisome v. Port Auth. of New York and New Jersey,* 948 F.2d 1370, 1375 (2d Cir. 1991)). "In other words, 'the statistical disparity must be sufficiently substantial to raise an inference of causation.'" *Id.* (quoting *NAACP v. Town of East Haven,* 70 F.3d 219, 225 (2d Cir.1995)). A plaintiff may establish his prima facie case "by showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination." *Waisome,* 948 F.2d at 1375. The court is mindful that there is "no minimum statistical threshold" and that "[c]ourts should take a 'case-by-case approach' in judging the significance or substantiality of disparities, one that considers not only the statistics but also the surrounding facts and circumstances." *Id.* at 1376 (citations omitted).

Upon plaintiffs' showing of a prima facie case, the burden shifts to defendants to demonstrate that the facially neutral policy or practice has a "manifest relationship" to the employment in question. *See NAACP v. Town of East Haven,* 70 F.3d at 225. "If the employer makes such a showing, 'the plaintiff may nonetheless prevail if he can suggest alternative tests or selection methods that would meet the employer's legitimate needs while reducing the ... disparate impact of the employer's practices.'" *Renaldi,* 954 F.Supp. at 619 (quoting *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140, 1147 (2d Cir.1991)).

In the instant case, defendants are not entitled to summary judgment on plaintiffs' disparate impact claim. Plaintiffs have identified the RIF as the specific employment practice that had a disparate impact upon them. Through its statistical evidence, plaintiffs demonstrated that this practice had an adverse impact on defendants' older employees. As more fully discussed *supra,* plaintiffs have shown that the disparity found is statistically significant in that their expert Dr. Greenberg attested that the chance of the disparate impact occurring on the protected class by chance is less than one in 1000. *See* Greenberg Aff. at ¶¶ 10–11 (the disparity found "was extremely unlikely to have arisen by chance or through the use of any age neutral criterion."); *see also Waisome,* 948 F.2d at 1376 (a finding of one in 384 by chance that the result is random is "generally highly probative of discriminatory treatment."). While this statistical disparity alone could possibly establish plaintiffs' prima facie case, when coupled with the other evidence of discrimination contained in the record, plaintiffs have established their prima facie case. *Id.* at 1375.

In rebuttal, defendants have offered no statistical reports or expert opinions. Defendants maintain that the RIF was necessitated by the budgetary crisis and that the statistical disparity is explained by the fact that the Chiefs are all management level and that the 1985 earmarking continued to allow the Chiefs to age without the hiring of younger Chiefs. As discussed, there are genuine issues of material fact with respect to the trustworthiness of defendants' business justification that precludes summary judgment at this stage. Accordingly, the court also de-

nies defendants' motion for summary judgment on plaintiffs' disparate impact claim.

## IV. CONCLUSION

For the foregoing reasons, the court DISMISSES plaintiffs' fifth cause of action under the New York Human Rights Law for lack of subject matter jurisdiction. The court DENIES defendants' motion for summary judgment on the remaining causes of action. Finally, the court DENIES defendants' motions for costs and sanctions and to preclude the introduction of evidence, as well as their motions to dismiss certain members of the opt-in class.

IT IS SO ORDERED.